J. WILCZINSKI *v.* LOUISVILLE, NEW ORLEANS & TEXAS RAILWAY CO. ET AL.

1. CHANCERY COURT. *Reformation of writing. Mistake. Clear proof necessary.*

One seeking reformation of a written instrument against the consent of another person in interest on the ground of mistake, must show clearly and satisfactorily that the instrument as written fails to express the real agreement made by the parties.

2. SAME. *Contract. Imposition of new terms, when refused.*

Courts cannot impose on one contracting party the burden of an agreement into which such party did not intend to enter, in order to protect the other party in supposed rights he intended to reserve or acquire, when by the exercise of slight care he would have discovered that by his contract as written such rights were not reserved, but by necessary implication were denied.

3. GRANT. *Purpose of. Construction; where language is plain.*

If a certain use is plainly and exclusively within the language of a grant, the purpose as expressed will be effectuated without looking to any extrinsic circumstances to determine the intention of the parties.

4. SAME. *Nature of use doubtful. Extrinsic evidence.*

If the nature of the use is doubtful and not necessarily included in the language employed, proof of extrinsic circumstances in interpreting the contract is competent.

5. SAME. *Words of doubtful import. Meaning of parties.*

The court will not make a contract, but will find the one made by the parties. This must be in the words employed, unless they are of doubtful import, in which case such words are to be taken as meaning that which the parties intended and understood them to mean, to discover which evidence of attendant circumstances is admissible.

6. GRANT.   *Words "railroad purposes" in a grant.   Evidence to explain.*

    Under a grant of land to a railway company for "railroad purposes, and none other," where a question arises as to whether a certain use attempted to be made of the property is within the terms of the contract, the situation and surroundings of the subject-matter, the consideration, and other circumstances attending the execution of the instrument may be shown in evidence.   The court places itself in the situation of the parties, in order to discover the meaning of the words used and whether the contemplated use is allowable.

7. SAME.   *Case in judgment.   Injunction against improper use.*

    In consideration of the location of a depot and junction on his place, the owner of a large body of land granted to a railroad company the right of way across the same, and two acres near the middle of the tract, "to be used for railroad purposes only and none other."   It was to the advantage of the owner to secure the depot on his place; but he was merchandising there, and, among other things, bought and shipped cotton-seed in bulk, and he was desirous, as the company knew, of preventing competition.   To this end, he retained ownership of the surrounding land.   As was its custom elsewhere, the company licensed other parties (rival merchants) to erect on the depot grounds a house in which to store seed for shipment in bulk.   *Held,* that this is not a "railroad purpose and none other" within the meaning of the contract, and that the owner is entitled to an injunction against the erection of such a house on the depot grounds, or on the right of way within the limits of his land.

FROM the chancery court of Washington county.

HON. W. R. TRIGG, Chancellor.

Bill filed by appellant, Wilczinski, for reformation of a written contract and for an injunction.   A preliminary injunction was granted; but on final hearing a decree was entered in favor of defendants, and the injunction was dissolved, from which decree complainant appealed.

The facts are stated in the opinion of the court.

*Campbell & Starling,* for appellant.

The words "railroad purposes only and none other," not only limit the estate conveyed to an easement, but restrict the use, and deprive the railroad company of all uses which are simply convenient and profitable, and in which the public is not concerned. Generally a railroad company may use its lands for its own *and* private purposes also; but that would not be *" railroad purposes*

*only.*" Railroad purposes are in their nature *public.* For this reason, the power of eminent domain may be invoked to obtain land for a railroad; but such a corporation cannot invoke this power for a *private* purpose, as for building a branch line to a private brickyard. *R. R. Co.* v. *Wiltse*, (Ill.) 6 N. E. Rep. 49, or for building a " warehouse," under general authority to construct a railroad. *Hamilton* v. *R. R. Co.*, 1 Md. 553.

To take land under the right of eminent domain, and devote it to private business, is wholly inconsistent with railroad purposes. *Proprietors, etc.,* v. *R. R. Co.*, 104 Mass. 1.

Where the land is acquired by *contract*, and the railway covenants to use it *only* for railroad purposes, any use of it for private business, though in connection with railroad purposes, would be a violation of the limited use, and we maintain would entitle the former owner to injunction.

In the court below, opposite counsel cited and relied upon the following authorities: *Pierce* v. *Boston & L. R. Cor.*, 141 Mass. 481; *Hoggatt* v. *R. R. Co.*, 34 La. An. 624, and *R. R. Co.* v. *Richardson*, 91 U. S. 454. In those cases the general principle is recognized that property taken by a railroad company may be used for railroad purposes in conjunction with *incidental* purposes, if the general object in view is to increase the facilities and business of the railroad. But these cases do not hold that such *conjoint* use is " a railroad purpose *only, and none other*," and hence they are distinguishable from this case. In Pierce on Railroads, p. 159, it is said that a railroad company may, within its location, erect buildings, or allow others to do so; but this refers to buildings *required in its business*, and they must be for the use of the *public generally*, and not for particular individuals.

The situation of the parties and the property, and the intention and purposes of the parties in making the contract will aid in the construction of its terms; and one of the parties will be held to that *meaning* which he knew the other party *supposed the words to bear*, if this can be done without making a new contract. 2 Pars. on Con., p. 499.

We insist that the facts of this case show that complainant was

anxious to prevent competition in his business, and that the restriction in the contract was intended to prevent the erection of just such a house as the railroad company now proposes to allow built on the land. By reason of his own seed-house near the depot, appellant could handle seed fifty cents a ton cheaper than others, and he did not propose to give up this advantage. Were the restrictive words in the deed intended to prevent the fee in the land from passing, or was not the purpose to limit the *use?*

Colonel Percy, who represented the company, and who wrote the deed, testifies that he explained to appellant at the time that, because of his owning the surrounding land, he could control the situation ; and that the company could not allow the use of the land by individuals for mercantile establishments, or *anything similar.* Thus it is put beyond controversy that appellant's purpose was to prevent *any* private use of the land, and this was well understood by the company.

All contracts made by the condemning party, whereby the privileges, wholly or in part, are obtained without condemnation, are construed strongly in *favor of the owner.* Mills Em. Domain, §§ 110, 114.

As in case of exemption from taxation, the rule of construction is against the railroad. An exemption from taxation of "property necessarily used in operating a railroad " does not exempt an inn owned by the company, and used *principally* for persons who may apply as guests, although used to accommodate passengers over said railroad. 29 Wis. 116. See also 34 Wis. 271 ; 48 Ib. 666.

In this case the seed-house was to be used exclusively by Weis & Goldstein ; it was to be *their* property, and the public would have no right to use it. It was to be simply a warehouse, a mere adjunct to their mercantile business. When the injunction was granted, they declined to take seed they had contracted for. This shows what an important factor it was in their business.

We submit that the court erred in not reforming the contract. Pom. Eq. Ju., § 845.

But we insist that appellant was entitled to the injunction on a proper construction of the contract as written.

*R. B. Campbell,* of counsel for appellant, made an oral argument.

*W. P. & J. B. Harris,* on the same side.

There is no question here of the right of the railroad company to erect a *public* seed-house, but as to its right to authorize the erection of a private storage-house on the depot grounds, to be used in connection with the business of *dealing* in cotton-seed.

In construing the contract as written, the court will consider that appellant had erected a seed-house near the railroad, and that it was his expressed desire to exclude others from competition in his business at that point. The court will place itself in the position of the parties, with their surroundings, and from that point of view determine the intention by the apparent objects proposed by the contract. The question is as to the effect of the words, "for railroad purposes only and none other." The words "railroad purposes" have one meaning when measured by the rule applicable to a grant by the state of the power of eminent domain, and another where they are employed to measure the *legal capacity to utilize land* acquired or owned. See *Bank* v. *Tennessee,* 104 U. S. 493; *State* v. *Newark,* 25 N. J. Law 315; *R. R. Co.* v. *Berks Co.,* 6 Pa. St. 496. There are things which belong to the class of optional uses or permissive powers, which may be limited by contract. 77 Ala. 176, So. Rep., April, 1888, p. 689.

The right of appellant to reserve for himself a place to erect a private warehouse for seed, and to exclude others from like use of the granted land is unquestionable. Here the object was, not simply to secure a reverter, for that would follow in any event in case of an abandonment of the land. The purpose had in view is so obvious and influential that it may be assumed as the chief object of the grantor. He desired to retain a personal advantage as the owner of the surrounding land. It would enhance the value of his land, and he wanted the advantages of a merchant doing business there. These objects would be defeated by allowing the proposed use of the grounds. To sustain the contention of the company, would be to break down all lines and allow it to lay off the depot grounds into lots for oil-mills, compresses, cotton buyers' offices and

the like.    All these in a sense are used to prepare commodities for shipment.    Once we cross the line and allow the company to cooperate with private enterprise in schemes of mere profit, a power or privilege over one conveys it over all.    The incidental connections are infinite.

The grantor here plainly intended to restrict the use of the ground for the railroad only, and to exclude private enterprises altogether. If we concede in such a case the right of a private party to erect a grain-elevator, warehouses, platforms and the like, these must be for the *public at large.*

Here the attempted use is not for railroad purposes exclusively, and we have the right under the contract to insist that it be denied.

We think the cases relied on by opposite counsel strengthen rather than impair our position.    In them is the recognition of the distinction between public and private use.

Where a charter gives the right to acquire land for right of way and stations by condemnation or purchase, the acquisition by purchase and donation stand on the same footing.    1 Redfield on Railways 221.

As to the distinction between grants for purposes generally, and grants in which the land is to be *used* exclusively, we cite *University* v. *People,* 99 U. S. 309.

This grant is not for railroad purposes generally, but the language carries with it the idea of direct use by the corporation in its business, and excludes the permission to private dealers to use it in their business exclusively and as an accessory.    The contract is to be construed most strongly in favor of the grantor and against the enlargement of corporate privileges.

*W. P. Harris,* of counsel for appellant, made an oral argument.

*Yerger & Percy,* for appellee, L., N. O. & T. Ry. Co.

The evidence in this case is clearly insufficient to warrant a reformation of the contract on the ground of mistake.    2 Story's Eq., Jur., p. 325 and note.

Then, will the court distort the meaning of the words used to accomplish the purpose desired by the appellant?    If in certain

cases courts will construe an instrument, as far as possible in ac-
cordance with what was clearly the intention of the parties, this is
not a proper case for it.   The claim of appellant is not supported
even by his own testimony.   The words in the original memo-
randum giving the complainant exclusive privileges, as insisted
upon by him, were purposely stricken out and were not embraced
in the deed.   If he made any mistake it was not in the execution
of the papers, but in not being able to forecast results.   Carry out
his idea of the donation, and he conveyed to the railroad the depot
ground with such a qualification as that it could not handle cotton-
seed in bulk, except from his warehouse.   Counsel admit the
necessity of seed-houses in the railroad business, and that this mode
of handling cotton-seed is a legitimate railroad purpose, but urge
that the house must be for the use of the public and not for the
use of an individual.   The mode of occupation and the degree
of exclusiveness necessary for the convenient exercise of its
franchises, are within the discretion of the corporation.   104
Mass. 1.   In what respect does appellant's rights differ from those
of one whose land has been condemned and taken?   On this point,
see Mills Em. Dom. 160, 496.   Rights acquired by deed are
ordinarily the same as in case of condemnation.   Ib. 110.   The
mode in which the land is acquired does not affect the rights of the
original owner.   Whether conveyed to the railroad company or
taken by condemnation, in case of abandonment, the original owner
can re-enter; and for a misuse he can bring the appropriate remedy.
*Proprietors, etc.,* v. *R. R. Co.,* 104 Mass. 1.

The keeping of a seed-house for storage of cotton-seed for ship-
ment is certainly a railroad purpose; and it is both necessary and
convenient for the various shippers to have different houses or
compartments furnished for each.   This is especially true, as the
railroad only ships the seed in carload lots, and the shipper must
assume the risk and trouble of taking care of the seed while ac-
cumulating.   This arrangement does not interfere with the other
business of the railroad but greatly facilitates it, and enables the
road to give reduced rates to all on cotton-seed.

The company can itself put up seed-houses and divide them into

compartments, giving to each shipper control of one as a place to store his seed until a carload accumulates. No question about that. Is it any less a railroad purpose that the shipper erects the house by permission of the company? In either case the seed will be put there for shipment, and for no other purpose.

In case of exemption from taxation, it is not essential that the property necessarily used in operating the railroad shall be *exclusively* so used. Cooley on Taxation 204 and notes. It suffices to show that such is its principal use. Desty on Taxation, vol 1, p. 159 ; 48 Wis. 660. See also 34 Wis. 271 ; 29 Ib. 116.

The company may within its location erect buildings required in its business, or allow others to erect them. Pierce on R. R. 159 ; Mills Em. Dom. 59.

As to the purposes for which a railroad company may use its lands, see *Tel. Co.* v. *Rich*, 19 Kan. 517 ; *Pierce* v. *Boston & L. R. Co.*, 141 Mass. 481 ; *Hoggatt* v. *R. R. Co.*, 34 La. An. 624. Whether the company or the shipper builds the warehouse, the burden on the land is identical, and in neither case can the original owner complain.

If it is true that this donation is " on all-fours " with the usual condemnations, the doctrine contended for would at one blow render useless the vast sums that have been invested in seed-houses, ice depots, grain elevators, and other storage buildings that have been erected all over this country on land granted to or condemned for railroads ; and this without conferring a benefit on any one, and without the support of authority.

*W. G. Yerger*, of counsel for appellees, made an oral argument.

*Phelps & Skinner*, for appellees, Weiss & Goldstein.

1. There are two effective defenses to the attempted reformation of the contract. First, the proof of mistake is wholly insufficient. To warrant reformation the evidence must be clear and satisfactory, leaving no doubt in the mind of the court. 2 Pom. Eq., § 847. Secondly, the condition sought to be inserted, giving the complainant exclusive privileges in the use of a public depot, would be void.

2. Before property can be taken by the exercise of the power of

eminent domain, the courts are required to approve the use as a *public* one.  When this is done it legalizes the appropriation of the property to a multitude of *incidental* uses, as a workshop or an eating-house for a railroad.

In determining what a " railroad purpose " is, we find that *any* use of the property is justifiable which has for its *main object* the successful and *convenient* operation of the railroad ; and the company will not be controlled in its discretion as to this, unless there is manifest abuse.  1 Wood Ry. L., § 170.  A different rule applies to exemptions from taxation ; these only include property *necessary* to the operation of the road.  Pierce on R. R., p. 485.  Besides, exemptions, like grants by the sovereign power, are strictly construed in favor of the public.

As to the rules of construction applicable in a case like this, and the uses to which the property of a railroad may be devoted, we cite the leading case of *Proprietors, etc.,* v. *R. R. Co.,* 104 Mass. 1 (s. c. 6 Am. R. 181).  It is quoted and affirmed in the later case of *Peirce* v. *B. and L. R. Cor.,* 141 Mass. 481, and applied to an extreme state of facts.  See also *Hoggatt* v. *R. R. Co.,* 34 La. An. 624.  We call the attention of the court specially to the facts and the language of the opinions in those cases.  See also 1 Wood Ry. L., § 226 ; *Tel. Co.* v. *Rich,* 19 Kan. 517.  These authorities show that it is no objection to the use that it serves the private purposes of other parties as well as the purpose of the railroad company.  The supreme court of the United States affirms the principles for which we contend, under circumstances almost identical with the facts of this case in *Ry. Co.* v. *Richardson,* 91 U. S. 454.  There the court says that, while the railroad is not at liberty to alienate any part of the land within the line of its roadway so as to interfere with the use of its franchise, " we are not prepared to assert that it may not license the erection of buildings for its *convenience, even though they may be also for the convenience of others.*  It is not doubted that the defendant might have erected similar structures on the ground on which plaintiff's buildings were placed, if in its judgment the structures were convenient for the receipt and delivery of freight on its road.  And, if the com-

pany might have put up the buildings, why might it not license others to do the same thing for the same object, namely, the *increase of its facilities for the receipt and delivery of its freight?*"

Opposing counsel suggest that the receiving and delivery of freight in that case was for the *general public.* It is difficult to see how that would help the case of appellant. But there is no such intimation in the statement of the case; indeed the contrary appears.

Generally, it must be admitted, that lands condemned and taken for public use and those donated or conveyed for that purpose, are governed by the same limitations. Pierce on R. R., p. 133 ; 1 Wood Ry. L., § 208.

As to the words " for railroad purposes only and none other," we deny that these words create any distinction ; but, if they do, the facts of this case show that we are clearly within the most restrictive construction that can be placed upon them. Such words are usually employed to convey the easement to the railroad, where the intent is to give the largest powers necessary. If the grantor intends any restriction, it must be made to appear. Pierce, p. 133. If not made to appear by definite designation, under the general rule, the instrument will be construed most strongly against the grantor. See Pierce, 484 ; *R. R. Co.* v. *Supervisors,* 48 Wis. 666.

The error of appellant's position lies in the assumption that the seed-house is to be used otherwise than for a railroad purpose. It was to be used *solely for storing cotton-seed for shipment on the railroad.*

The *real* ground of complaint is that the seed-house was to be used by a *rival merchant, dealing in cotton-seed on an adjoining place.* There are, however, no words in the contract to exclude other persons from the common use of the depot grounds for railroad purposes; and, if there had been such restriction, it would have been void. The mode of shipment in bulk being necessary, how could it be conducted otherwise than in separate seed-houses ? This arrangement gives lower freight, and adds fifty cents per ton to the price of cotton-seed. It is also highly advantageous to the railroad.

The attitude of appellant is peculiar. He has a cotton-seed house on the same depot grounds, and the burden of his complaint is that the railroad company will not give him a *monopoly* of seed shipping at that depot. The traffic in cotton-seed is very great, and public policy forbids the restriction on it here sought to be enforced.

We ask an affirmance, with a decree for damages.

*W. G. Phelps,* of counsel for appellees, made an oral argument.

COOPER, J., delivered the opinion of the court.

This is a controversy between the appellant and appellees, touching the rights of the respective parties under a contract made between the appellant and the railroad company for a right of way over his plantation in Washington county. The contract is in writing, and recites that the appellant is the owner of a certain plantation known as the " Matilda plantation," in Washington county, across which the right of way of the railroad had been laid by a preliminary survey, on a line known to both parties; that the company contemplated building another road which would also run across said plantation on a line not yet fixed, but that the intersection of the two roads would be upon said plantation. In consideration of the advantages to accrue to him by the location of said roads and the establishment of a depot on his farm, the appellant contracted to convey the necessary rights of way and lands upon which to place all needed switches, Y's, and side tracks and also two acres for a depot site. There are many stipulations and limitations in the contract as to what was to be done and not done by the company, but it is unnecessary to recite them since they cast no light upon the point in controversy, and serve only to show that the grant by appellant was not a donation to the company, but that he received valuable and sufficient consideration therefor. The contract contains the following clause, which is the foundation of the present controversy : " Said right of way and two acres of ground are conveyed for, and are to be used for railroad purposes only and none other, and are to revert to the party of the first part when said company ceases to use them."

It appears in evidence that cotton-seed is one of the articles transported by the company in large quantities; the usual modes of shipment are in bulk in car lots, and in sacks in car lots or less. The rates of freight for car lots are the same whether the seed is in bulk or in sacks, but the cost of sacking makes it cheaper to the shipper to ship in bulk. The company refuses to handle seed in bulk in less than car lots, and has made no provision by which one desiring to ship in bulk can deliver a part of a carload, or deposit the same at the station until the quantity necessary for shipment shall be secured. It, however, habitually permits any one desiring so to do, to erect on its right of way at its depots or along its lines, houses in which seed may be deposited until car lots are secured, and furnishes cars, which, being loaded by the shipper, are received by the company for transportation.

The appellees, Weis & Golstein, obtained permission from the company to erect such house on the two acres granted by appellant for depot purposes and were about to build the house, when appellant enjoined them from so doing, and enjoined the company from permitting any house to be there erected by Weis & Golstein or any other person.

The bill charges and the evidence shows that at and before the making of the contract between appellant and the company, he was the owner of the Matilda plantation, and had, located thereon, a country store where he transacted a lucrative business, a part of which consisted in buying cotton-seed from the planters and shipping the same to market. The right of way of one of the railroads had been located across his plantation, and a jury had awarded him damages at the rate of one hundred dollars per acre for the land taken. Appellant was anxious to have a depot on his place, and since the other contemplated road would, or might conveniently intersect the located road on his farm, the company could accede to his wishes.

To secure the location of the depot the appellant was willing to renounce his claim for damages, but it was especially important to him that the location of the depot should not bring him in competition with rival merchants, and, since he was the owner of the

adjoining land, no rival establishment could be set up unless a place of business could be secured on the ground granted to the company. Preliminary to the execution of the contract the appellant made a memorandum containing the terms upon which he proposed to grant the right of way and depot grounds, and carried it to the attorney of the company as a guide in drawing the contract. This attorney (W. A. Percy) was the general attorney of the road, and stood as its representative in making the contract between the parties.

The memorandum furnished by appellant contained this stipulation : " The R. R. Co. is to establish a regular depot, the two acres donated to be used for depot purposes only (J. Wilczinski reserving the right to locate a store and seed-house at such point as J. W. may designate alongside of R. R. depot or track ; he to have the exclusive right to erect any and all buildings to be used for transaction of any business or trade of any kind).    In the event of the R. R. Co. should abandon the line of road through the lands hereby donated should revert to J. Wilczinski."

Upon examining this memorandum, Mr. Percy objected to the clause inclosed in brackets, and drew his pencil across it, declining to accede to its provisions.    Wilczinski testifies that Mr. Percy stated the provision to be unnecessary, saying that the contract as he then prepared it included the same privilege by the limitation of the use of the land " for railroad purposes and none other."

Percy testified that, " Wilczinski was very anxious to secure the depot and junction upon his Matilda plantation. As the company was taking a large amount of his land for its right of way, it desired, if possible, to accommodate him in that way, and secure the right of way without charge. The chief engineer (Mr. Elliott) and I had several conferences with Wilczinski, and finally came to a definite understanding, that if the company would locate its depot and junction on the plantation, and make certain agreements which are embodied in the contract in regard to the same, he would convey the right of way, and the necessary depot grounds free of charge.    Wilczinski's idea at the time was frequently expressed, and concurred in by the engineer and myself, that the location of

the depot and junction on his place would probably build up a little village of some importance, and he would derive considerable profit from it. He was engaged in merchandising in the vicinity, and expressed himself as very desirous of retaining the monopoly of that business, and being able to control it. My recollection is that he brought me a paper embodying the conditions and reservations he desired to have made in the contract. I went over it very carefully to see if we could agree to it, and then explained to him that we could not grant the right to him, or to any one else, to locate stores or any other buildings at any point alongside of our depot or track on the right of way. I explained to him that it was absolutely necessary that the company should have the exclusive right to control its own depot grounds and right of way, and that our policy was never to make any agreement with regard to the use of those grounds that would deprive us of that exclusive right. I explained to him fully that the expression in the contract, 'for railroad purposes only, and none other,' would deprive us of the right of allowing the location of stores upon the depot grounds by other persons, or of putting them there ourselves; that under that expression we could only use the depot grounds and right of way for legitimate railroad purposes for the business of the road, and could not allow the use of them by individuals for their own private use for mercantile establishments, or anything similar, nor could we use them ourselves for such purposes. As I recollect very distinctly, Wilczinski's apprehension was that the company might permit other parties to go there and locate stores on the depot grounds, and thereby become rivals of his in the mercantile business. In addition to the explanation I have already stated, I reminded him that he was the exclusive owner of all the ground around the depot, and, as we would have no right to permit such building to be constructed, or such business to be carried on on the depot grounds, it would give him the control of the situation. I do not think the question of seed-houses entered into the discussion at all, or was contemplated by either party as being material. I certainly should never have agreed myself to a contract which would preclude the company from constructing seed-houses for the shipment of cotton-

seed in bulk, if he had intimated such desire.  I ran my pencil through that portion of the memorandum, reserving to him the exclusive right of locating stores and seed-houses at such points as he might designate, in his presence, I think ; I certainly showed it to him afterward, as that part of the memorandum to which I could not agree, and explained to him very fully why."

The appellees, Weis & Golstein, have rented an adjoining plantation, on which, and within two hundred and fifty yards of the depot, they are conducting a mercantile business in rivalry with Wilczinski.  A part of this business is dealing in cotton-seed, and to facilitate their shipments of seed, they desire to erect the seed-house on the depot grounds.  By storing the seed in such house they will be relieved of the expense of sacking them, or of handling them in bulk a second time.  The custom of parties having seed-houses on the railroad right of way is to store the seed as bought in small lots in the houses, and to load them directly on the cars when car lots are secured.  The saving by this course is about fifty cents per ton.

The appellant seeks relief, first, by reformation of the contract by inserting in it the words which were struck from the memorandum by the attorney of the company, and a specific compliance with the contract thus reformed.  But, if this be denied, then, he contends that it is a violation of the contract as executed for the company to permit a seed-house to be erected on the depot grounds by Weis & Golstein for the uses contemplated by them.  For the appellees it is asserted that no fraud, accident, or mistake is shown in the execution of the contract by reason of which it ought to be reformed ; and that the contemplated use of the grounds is a " railroad purpose," and being such is within the terms of the contract.

The facts disclosed, even by the testimony of appellant, are wholly insufficient to justify a reformation of the written contract. The exclusive privilege sought to be thus secured of the right to erect private buildings on the depot grounds and right of way, as noted in the memorandum made by him, is one which by no sort of construction of the language of the contract he signed is found to be reserved.  He at least knew that he had employed apt words to

66 MISS.—39

reserve the right, and these words were, as he himself states, erased from the memorandum by Mr. Percy, and a contract prepared in which the stipulation was omitted. It is inconceivable that the attorney should state or the complainant believe that a limitation preventing the company from permitting the property to be devoted to any other than "railroad purposes" was the equivalent of a reservation of a right of private use by the complainant himself.

By no possible construction, however liberal, could such meaning·be found within the import of the words used. In view of the history of the transaction, given by the attorney of the road, it is manifest that a reformation of the contract in accordance with the prayer of the bill would impose on the company a contract it did not intend to make, that it would not have made, and the very one it distinctly declined to make. Courts cannot impose on one contracting party the burden of an agreement into which he did not intend to enter, to protect the other in supposed rights he intended to reserve or acquire, when the exercise of the slightest care would have discovered that by his contract as written such rights were not only not reserved, but by necessary implication were denied. It would be a waste of time to refer to those settled rules governing the reformation of written instruments ; to the limitations under which equity proceeds, to the clearness of proof of mistake required. On this branch of the case complainant fails to reach a position from which argument can be made.

The real controversy is whether the use to which the land is about to be devoted is a "railroad purpose and none other."

If it is such purpose, plainly and exclusively, it is within the use permitted by the grant, and relief must be denied. On the other hand, if the nature of the use is of doubtful character, and is not necessarily included in the language employed, it is competent to look to extrinsic circumstances to determine whether it falls within or without the intention of the parties as expressed by the contract.

We cannot make a contract for the parties ; we must find the one made by them, and this must be found in the words they have employed. But if the words are of doubtful import, and may mean

indifferently either of two things, they are to be taken as meaning that which the parties intended and understood them to mean, to discover which the evidence of attendant circumstances is competent. The court, informed of the circumstances, puts itself in the situation of the parties, and from that standpoint discovers what is the meaning of the words of the contract.

We might rely upon the elaborate and able briefs presented by counsel as demonstrating the uncertainty of what is a " railroad purpose," and whether the contemplated use of the seed-house is or is not of that character. The subject takes color from the direction in which light falls on it. It is primarily a railroad purpose or a private use as viewed from the office of the company, or from the store of its co-appellees. The company permits the building to be erected primarily to furnish a convenience to the shipper, and views as an incident the convenience it will afford to the business of the merchant. The merchants desire the building, primarily as an adjunct to their mercantile business, as an incident to which they supply the seed acquired for shipment. In one sense the use is for railroad purposes, for under the license of the company, Weis & Goldstein could not conduct the business of buying and selling seed in the building on the depot grounds; they could use it only as a place in which to deposit the seed intended for shipment. In this view, the building would be accessory to the business of the company.

But until the seed should be delivered from the house, the company would have no custody of, nor responsibility for them. The building would be the private property of Weis & Goldstein, which neither the railroad, nor other shippers could of right use. The seed deposited in the house by Weis & Goldstein though intended for shipment would continue in their possession, and subject to be shipped or otherwise disposed of as they might elect.

Placing ourselves in the attitude of the parties, the question involved is not difficult of solution. The testimony of Mr. Percy, the attorney for the company, discloses beyond doubt that the company understood that Wilczinski was stipulating for a depot on his plantation, and the preservation of the monopoly of the business in which he was engaged at that place, and which, being owner of

the surrounding soil, he could retain if the company should be restrained from permitting a rival to establish his buildings on the ground granted for depot purposes and right of way. Without doubt this was the substance of the right he intended, and the company understood him, to reserve. As a convenience to his business he desired to secure the right to place his store and seed-house on the grounds of the depot, but this the company refused to permit, and Mr. Percy explained to him the rule the company had adopted of reserving full control of its grounds. But he stated that by restricting the use to that of " railroad purposes and none other " the company could not itself erect, or permit others to erect buildings on the premises in which private business could be transacted. In other words, that the privilege of putting store and seed-houses on the premises could not be left to Wilczinski, but that under the language of the contract such right could not be given to another; wherefore, under the contract, and by reason of his ownership of the adjacent land, Wilczinski could maintain his monopoly in the business in which he was engaged.

That such was the intention of the parties we think is shown without doubt. The language employed was meant to carry out this intention, and is susceptible of that construction by which it will be upheld.

Interpreting the words of the contract in the light of the circumstances, we discover the thing agreed on between the parties : the substance is found beneath and within the words employed and without violence to them. We are therefore of opinion that the contemplated use of the land is not a " railroad purpose and none other," within the meaning of the words of the parties, and that complainant is entitled to relief to the extent of an injunction against the erection of a seed-house on the depot grounds or right of way, within the limits of the Matilda plantation, by the appellees, Weis & Goldstein.

*Wherefore the decree is reversed, and the injunction restored and perpetuated.*